**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| BANK OF AMERICA, N.A. ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No.: 4:10-cv-00563-RWS |
| ) | |
| ANALYTICS, INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |

**RECEIVER'S AMENDED MOTION TO APPROVE RECEIVERSHIP WIND DOWN AND OTHER ANCILLARY RELIEF[1]**

COMES NOW Morris-Anderson & Associates, Ltd. (the "Receiver"), the duly-appointed Receiver in this matter, by counsel, and for its *Amended Motion* states as follows:

### I.    BACKGROUND

**A.    The Receivership Case and the Receivership Companies**

1.    On April 1, 2010, Bank of America, N.A. ("Plaintiff" or the "Bank") instituted this receivership by filing a Complaint (the "Complaint") seeking, *inter alia*, the appointment of a Receiver for the collateral (the "Collateral") on which the Plaintiff held a security interest.  On April 9, 2010, the Court entered an Order Appointing Receiver (as amended, the "Appointment Order"), pursuant to which it appointed the Receiver as receiver of the Collateral in the possession of Analytics, Inc., AniClin Preclinical Services, LLC, Chemir Analytical Services, LLC, CAS-MI Laboratories, LLC, and the division of Azopharma Contract Pharmaceutical Services, LLC that was formerly known as Cyanta Analytical Laboratories, Inc. prior to a merger in or about September, 2009 (collectively, the "Receivership Companies" or the "Debtors").

---

[1] This Amended Motion supersedes the original motion filed on May 2, 2012 at Dkt. # 160.

2. The Receivership Companies were all part of a group of companies owned directly or indirectly by Dr. Shri Thanedar. Dr. Thanedar created a maze of different entities with similar names. Some of Dr. Thanedar's companies are involved in this receivership and others are not.

3. Analytics, Inc. is one of the Receivership Companies. It is a holding company that owned all of the stock or member interests of Chemir Analytical Services LLC and CAS-MI Laboratories, LLC, each of which is also a Receivership Company. Since Analytics, Inc. was a holding company, it had no employees and conducted no business itself.

4. Chemir Analytical Services LLC ("Chemir Analytical") operated a laboratory facility in Maryland Heights, Missouri. All of its employees worked out of the Missouri offices except for one sales person in California and another sales person in Massachusetts.

5. CAS-MI Laboratories, LLC ("CAS-MI") operated a laboratory facility in Ypsilanti, Michigan. All of its employees worked out of the Michigan facility.

6. AniClin Preclinical Services, LLC ("AniClin") operated an animal testing laboratory in rural New Jersey. All of AniClin's employees were employed out of its New Jersey facility. AniClin was NOT part of the Analytics, Inc. consolidated taxpayer group.

7. Cyanta Analytical Laboratories, Inc.'s ("Cyanta") situation is more complex and at times confusing. Cyanta historically operated a laboratory in Maryland Heights, Missouri that specialized in the pharmaceutical and medical device industry. Its facility was located in a building separate from but immediately adjacent to Chemir Analytical's facility in Maryland Heights.

8. Cyanta's business was originally conducted in a separate corporation, but Dr. Thanedar caused Cyanta's business to be merged into Azopharma Contract Pharmaceutical Services, LLC (hereinafter "Azopharma") in September of 2009. The rest of Azopharma Contract Pharmaceutical Services, LLC's business was operated in Florida. Only the Cyanta division of Azopharma operated in Missouri. None of the Cyanta division's employees were located in Florida.

9. The Cyanta division is part of this receivership case, but the balance of Azopharma is not. The non-Cyanta Azopharma assets were liquidated separately through an arrangement between its

secured lender, Bank of America, N.A., and Azopharma. The Receiver in this case had nothing to do with that liquidation.

### B.    The Operation of the Receivership Companies

10.    The Receiver took possession of the assets comprising the Receivership Companies on or about April 10, 2010. The Receiver immediately inventoried the assets, changed the locks, modified the signature authority on bank accounts and generally stabilized what had become a chaotic situation. The Receiver then began operating the businesses, most notably re-opening the Cyanta division which had been closed in the days immediately preceding the receivership. The Receiver has already described in detail its various activities during this period in a series of Reports of Receiver filed at docket nos. 49, 85, 123, 152, 152, 154, 156, and 157.

11.    The Receiver also identified all creditors holding claims against the Receivership Companies and gave notice of the receivership to these creditors. The Receiver established a procedure for creditors to file claims with the Receiver, and a total of 159 claims were filed (the "Filed Claims").

12.    The Receiver has filed all federal, state and local tax returns that are due on account of the years 2010 and 2011. As discussed below, the Receiver will have to file a stub return for the year 2012.

13.    Pursuant to the Appointment Order, the Receiver was also authorized to conduct an orderly sale of the Collateral, with the proceeds to be applied to pay the Receivership Companies' obligations to the Bank.

### C.    The Sale to EAG and the Last Minute Modifications to the Asset Purchase Agreement

14.    After an extensive marketing effort, the Receiver entered into the Asset Purchase Agreement to sell substantially all of the assets of Analytics, Inc., Chemir Analytical, CAS-MI, and the Cyanta division to EAG, Inc. ("EAG") (the "EAG Sale"). The EAG Sale was confirmed by the Court on February 23, 2011 with the entry of that certain *Order Approving Sale* (the "Sale Order") (Docket No. 147). EAG did not purchase any of Aniclin's assets or any non-Cyanta Azopharma assets.

15. On March 31, 2011, the Receiver closed on the EAG Sale, but not before some significant last minute changes were made to the transaction. On March 30, 2011, the day before the scheduled closing, EAG notified the Receiver that EAG had discovered via an online search that seven liens totaling $1,256,576 (the "Alleged Liens") had been filed in recent weeks against Azopharma Contract Pharmaceutical Services, LLC by the Missouri Department of Revenue. A single lien, comprising $1,233,344.14 of the total, had been filed on March 11, 2011, after the Court approved the EAG Sale but before closing. This discovery was particularly troublesome because the parties, for a number of legal and economic reasons, had established March 31, 2011 as the final deadline for the closing.

16. The Receiver immediately researched the Alleged Liens and concluded early in the morning of March 31, 2011 that all but one of the Alleged Liens had actually been filed against a non-receivership entity, "Azopharma Contract Services, Inc." This entity was a predecessor to Azopharma Pharmaceutical Contract Services, LLC, and the taxes claimed by Missouri mostly related to alleged payroll tax amounts due in 2005 through 2007, a time period in which Azopharma Contract Services, Inc. had no Missouri employees.

17. In order to preserve the March 31 closing, in the late afternoon of that date, the Receiver acceded to EAG's demands to escrow a portion of the purchase price until more could be learned about the Alleged Liens. Immediately following execution of the necessary amendment paperwork the transaction closed. Since the closing, pursuant to this Court's Order (dkt. #150), the Receiver has paid from the sale proceeds and other cash on hand the sum of the $22.4 million to the Bank. As of the date of the filing of this Motion, the Bank's remaining claim is approximately $1,053,000.

18. The sale culminated a remarkable turnaround of the businesses. Before the receivership was filed, the estimated enterprise value for the businesses was less than $10 million. By stabilizing operations, stemming the exodus of key accounts, reopening the Cyanta division, and developing a sound marketing program, the Receiver was able to more than double the enterprise value. In fact, the

Receiver's efforts were recognized by the Turnaround Management Association which named this engagement the "2011 Turnaround of the Year (Small Company)".

### D. The Escrow Agreement and the Subsequent Dispute

19. To facilitate the eleventh hour agreement, the Receiver and EAG entered into an Escrow Agreement dated April 11, 2011 (the "Escrow Agreement") with Silicon Valley Bank where $2 million of the purchase price was placed into escrow. The amount to be held in escrow was subsequently reduced to $800,000 by an Amendment to the Escrow Agreement (for ease of reference, the funds held in escrow shall be referred to as the "Escrowed Funds").

20. The escrow was established to provide a source of payment if EAG was subsequently deemed liable for any of the Receivership Companies' tax liabilities. Many states impose successor liability on the purchaser of business assets for the unpaid state taxes of the seller. These states typically have procedures where the parties can obtain a tax clearance certificate that permits the purchaser to close without fear of successor liability. The original Asset Purchase Agreement provided that the applicable sellers would obtain tax certificates from Missouri and Michigan, the two states where the assets EAG acquired were located. Because of the last minute discovery of the Alleged Liens, EAG required as part of the Amendment to the Asset Purchase Agreement that the universe of required tax certificates should be expanded to include four other states: Colorado, New Jersey, Florida and Illinois (these states shall be referred to as the "Additional States").

21. The Receiver believed at the time that EAG's request to require clearances from the Additional States was overkill for several reasons. First, and foremost, the Alleged Liens discovered by EAG has very little to do with the Receivership Companies. Second, the Receiver obtained Guaranteed Lien Releases from the State of Missouri for all of the Alleged Liens less than forty-eight hours after the issue first arose. Third, not all of the Receivership Companies were even registered to do business in every one of the Additional States. Finally, none of the assets acquired by EAG were located in the Additional States. Nevertheless, in order to permit the sale to close on the timeframe originally contemplated by the parties, the Receiver agreed to amend the Asset Purchase Agreement and to enter

into the Escrow Agreement. The Receiver was comforted by the fact that the Escrow Agreement included language that permitted the Receiver to provide to EAG "other written evidence reasonably satisfactory to EAG that the [Receivership Companies] have no tax liability in such states for which EAG or the purchased assets would be liable".

22. Soon after the Escrow Agreement and the Amendment were signed, however, EAG and the Receiver found themselves in a dispute. It proved impossible for the Receiver to obtain tax clearances in every one of the Additional States. For example, several of the Additional States would not issue a tax clearance letter unless that particular Receivership Company was registered to do business in that state. Even in those Additional States where it was possible to obtain tax clearances, it could be very difficult to do so. For example, several of the states would not accept the Receiver's signature on the required documents and instead required Dr. Thanedar to sign. New Jersey would not issue a tax clearance letter unless the requesting entity is going to be dissolved under New Jersey law, which was beyond the Receiver's power to control.

23. After considerable effort by the Receiver to assuage EAG's concerns, and after expending considerable receivership funds to chase down the elusive tax clearance certificates, EAG and the Receiver finally resolved their differences in March of 2012 by agreeing that EAG would retain $40,000 of the Escrowed Funds and the Receiver would cause certain state taxes to be paid in Missouri, Michigan and New Jersey. In exchange, EAG dropped its requirement that tax clearance certificates be obtained for every Receivership Company in every Additional State. As a result, the escrow was terminated and the Receiver received the remaining balance of the Escrowed Funds on or about March 20, 2012.

### E. The IRS Tax Claim

24. As part of its duties, the Receiver caused the 2010 state and federal income tax returns to be prepared and filed. The 2010 federal income tax return showed a tax due (including interest and

penalties) of $429,537. [2] The Receiver did not pay the tax due at the time the return was filed because it was obvious at that time that there would be insufficient funds to pay both the remaining portion of the Bank's secured claim AND the federal tax claim. On the one hand, a receiver is obligated to pay income taxes like anyone else. *See* 26 U.S.C. §6012(a)(3). On the other hand, the Bank holds a secured claim on the sale proceeds and the IRS holds merely an unsecured claim. To further complicate matters, the IRS retains the right to pursue a fiduciary such as a receiver if the fiduciary pays a non-IRS claim with lower priority. 26 U.S.C. §6904(a)(1)(B).

25. The Receiver included with the 2010 federal income tax return a written statement explaining its dilemma, but the IRS was unimpressed. It sent the Receiver an overdue notice on November 14, 2011 and thereafter sent an Intent to Levy notice on December 19, 2011. The Receiver contacted the IRS in person about the 2010 tax return and the reasons why the tax was not paid, and the IRS informally agreed to suspend any collection actions pending a resolution of this receivership case. The Internal Revenue Service then served the Receiver with a Form 2373 Statement of Internal Revenue Taxes Due as an Expense of Administration of an Estate (the "IRS Claim") wherein the IRS claims that that the total tax due, as of January 31, 2012, was $451,970.03 after interest and penalties were added..

26. On May 2, 2012, the Receiver filed an Objection to the IRS Claim (Dkt. # 161) (the "Claim Objection"). The IRS and the Receiver then entered into settlement discussions that culminated in an agreement where the Receiver would pay $215,000 to the IRS for 2010 income taxes with the remaining tax, interest, and penalties for 2010 to be abated (the "IRS Settlement"). On August 14, 2012, this Court entered its order approving the IRS Settlement and directing the Receiver to make the payment called for in the IRS Settlement (Dkt. # 172). On or about August 20, 2012, the Receiver caused a cashier's check for $215,000 to be delivered to the IRS in satisfaction of its payment obligations under the

---

[2] It is extremely unusual for a company in receivership to have taxable income. Unlike most receiverships, however, this one actually made money.

IRS Settlement, on August 28, 2012 the IRS filed a Stipulation for Dismissal (ECF # 173), and on August 29, 2012 the Court approved the Stipulation for Dismissal (ECF # 174).

## II. ACCOUNTING OF THE CURRENT FINANCIAL POSITION OF THE RECEIVERSHIP

27. A brief cash accounting (the "Accounting") of the receipts and expenditures of the receivership from April 11, 2010 through August 31, 2012 follows (thousands omitted and numbers rounded):

| | |
|---|---|
| Cash on hand when Receiver was appointed | $454 |
| Plus Sale Proceeds, net of any adjustments | $22,278 |
| Plus Cash collected by the Receivership | $14,212 |
| Expenses of administering the Receivership, including but not limited to payroll, cost of goods sold, general administration expenses, and professional fees | -$13,821 |
| Less Interim distribution to secured creditor, Bank of America, N.A. | -$22,400 |
| Less Payment of other state and federal tax obligations | -$329 |
| Remaining cash on hand (the "Distributable Funds") | $494 |

28. The Bank's remaining claim after accounting for the distributions made to the Bank to-date is approximately $1,053,000. The Bank holds a valid, perfected first priority security interest in the Distributable Funds.

## III. REMAINING WIND DOWN ACTIVITIES

29. The Receiver has identified the following steps that must be taken before a final distribution will be made.

    (a)    The Receivership Companies' 401(k) Pension Plan (the "Pension Plan") must be audited for the years 2011 and 2012 and, upon completion of the audit, the Pension Plan must be terminated. All amounts in the participants' individual accounts have already been distributed. The audit is already underway and must be completed by no later than October 15, 2012:

    (b)    The Receiver must file final federal and state income tax returns for 2012;

(c)   The Receiver must notify the holders of all Filed Claims of the status of the receivership and of the fact that funds will not be available to distribute to unsecured creditors;

(d)   The Receiver must distribute the Distributable Funds to the Bank[3]; and

(e)   The Receiver must apply for return of the $10,000 cash bond that it secured as a condition of its appointment.

### IV.   PROFESSIONAL FEES PAID BY THE RECEIVERSHIP

30.   The Appointment Order does not specifically require the Receiver or any professional retained by the Receiver to file fee applications.

31.   Nevertheless, the Receiver has already filed two fee applications in the case, resulting in orders entered by this court as follows:

| Date of Order | Fees & Expenses Allowed and Paid | Time Period Covered |
| --- | --- | --- |
| January 13, 2011 | $513,569.64 | 4/7/2010 to 8/31/2010 |
| May 3, 2011 | $397,935.49 | 9/1/2010 to 12/31/2010 |

32.   Since the Receiver's most recent fee application (which covered the period through December 31, 2010), the Receiver has incurred additional fees and expenses of $564,984.79.[4]

33.   The Receiver has also retained the services of several professionals to assist in the administration of the receivership estate. These professionals have been paid from the receivership estate on a current basis. None of these professionals has filed a fee application to-date. A summary of these professionals, the role they played and the amounts paid to them is as follows:

---

[3] Upon entry of an order terminating the receivership, the Receiver proposes to distribute to the Bank all of the Distributable Funds less a Contingency Reserve of $50,000 that will be held in reserve for unanticipated expenses, the balance of which will be distributed to the Bank in 180 days.

[4] Pursuant to this Court's order of August 24, 2010, the Receiver also received a transaction fee for investment banking services equal to $630,403.75 upon the closing of the EAG sale.

| Professional Firm | Role for Receiver | Fees & Expenses Paid | Approx. Time Period |
|---|---|---|---|
| Thompson Coburn LLP | General legal counsel | $517,344.24 | 4/12/2010 to 8/31/2012 |
| SFW Partners, LLC | Accountants | $92,643.00 | 5/1/10 to 8/31/12 |
| Benefits of Missouri, Inc. | Employee benefits advisor | $30,567.00 | 6/1/2010 to 8/31/2012 |
| Ed Kuper | Consultant | $21,595.39 | 4/1/2011 to 8/31/2012 |
| Honigman, Miller | Special Michigan tax counsel | $2,572.50 | 8/1/2010 TO 8/31/2012 |

## V.  JUDGMENT

34. The original Complaint that initiated this case includes a Count for the appointment of a Receiver (Count IV).

35. Since the Bank also filed a motion for appointment of a receiver, which was granted, this Court has not previously addressed Count IV.

36. In order to close this case and preserve fully the continued vitality of all of the orders entered by the Court to-date, including most notably its order authorizing the sale of the business, the Receiver suggests that this Court enter Judgment in favor of the Bank and against the Defendants on Count IV of the Complaint simultaneously with the entry of an order terminating the receivership.

37. By entering a Judgment on Count IV, the Court will only ratify what has been true since April of 2010, i.e. that a Receiver was in place and operating the businesses.

## VI.  CONCLUSION

38. The Receiver submits that it will shortly fulfill its obligations under the Appointment Order and applicable law and that this receivership may be terminated.

39. The Receiver requests this Court to authorize the Receiver to distribute a Notice to holders of Filed Claims ("Creditor Notice") in substantially the form attached hereto as **Exhibit A**. If one or more timely objections are submitted or if the Court deems a hearing necessary for any other reason, the Receiver requests that this Court schedule a hearing to consider entry of the proposed order attached

- 10 -

hereto as **Exhibit B** (the "Proposed Order"). If no timely objections to the Creditor Notice are submitted, the Receiver requests that the Court enter the Proposed Order without further hearing.

WHEREFORE, the Receiver respectfully requests this Court to:

(a) authorize and direct the Receiver to transmit the Creditor Notice to the holders of all Filed Claims at the addresses listed on the Filed Claims;

(b) if necessary, schedule a hearing on the Motion;

(c) at the appropriate time, enter the proposed order attached hereto as Exhibit B; and

(d) grant such other and further relief as the Court deems just and appropriate.

Dated: September 17, 2012

Respectfully submitted,

THOMPSON COBURN LLP

By: */s/ David A. Warfield*
David A. Warfield, ED Mo. #34288MO
Allison E. Graves, ED Mo. #60748MO
One US Bank Plaza
St. Louis, MO 63101
Phone (314) 552-6000
Fax (314) 552-7000
dwarfield@thompsoncoburn.com

*Attorneys for Receiver Morris-Anderson & Associates, Ltd.*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 17, 2012 the foregoing was served upon all parties receiving notice through the Court's CM/ECF system.

*/s/ David A. Warfield*

**Exhibit A**

**Form of Notice to Creditors**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| **BANK OF AMERICA, a national banking association,** ) ) ) | |
| **Plaintiff,** ) ) | Case No. 4:10-cv-00563-RWS |
| v. ) ) | |
| **ANALYTICS, INC., a Missouri corporation, *et al.*,** ) ) ) | |
| **Defendants.** ) ) ) | |

**RECEIVER'S NOTICE OF REPORT OF NO ANTICIPATED DISTRIBUTIONS AND OF MOTION TO WIND DOWN RECEIVERSHIP**

You are receiving this Notice because you timely filed a Proof of Claim (a "Filed Claim") in the above captioned case.

**PLEASE TAKE NOTICE** that Morris-Anderson & Associates, Ltd. was appointed the Receiver for certain assets of the Defendants on April 9, 2010 (as amended, the "Appointment Order").

**PLEASE TAKE NOTICE** that on February 23, 2011, this Court entered its Order authorizing the sale of substantially all of the Defendants' then remaining operating assets, and the Receiver has now substantially completed all of its duties under the Appointment Order.

**PLEASE TAKE FURTHER NOTICE** that a brief accounting (the "Accounting") of the Receivership is as follows: (000's omitted and numbers rounded):

| | |
|---|---:|
| Cash on hand when Receiver was appointed | $454 |
| Plus Sale Proceeds, net of any adjustments | $22,278 |
| Plus Cash collected by the Receivership | $14,212 |
| Expenses of administering the Receivership, including but not limited to payroll, cost of goods sold, general administration expenses, and professional fees | -$13,821 |
| Less Interim distribution to secured creditor, Bank of America, N.A. | -$22,400 |
| Less Payment of other state and federal tax obligations | -$329 |
| Remaining cash on hand (the "Distributable Funds") | $494 |

**PLEASE TAKE NOTICE** that after all of the receipts and payments described in the Accounting, the Defendants still owe Bank of America, N.A. (the "Bank") in excess of $1 million.

**PLEASE TAKE NOTICE that as a result of the foregoing the Receiver does not have sufficient funds to make a distribution to holders of general unsecured claims, and that the holders of Filed Claims will not receive any distributions from the Receivership on account of their Filed Claims.**

**PLEASE TAKE NOTICE** that the Receiver has filed with the Court a Motion (the "Motion") that seeks to (a) approve the Accounting, (b) approve all professional fees that have been incurred during the Receivership, (c) pay all remaining funds on hand to the Bank (subject only to a Contingency Reserve of $50,000 that will be held in reserve for unanticipated expenses, the balance of which will be distributed to the Bank in 180 days), (d) authorize the Receiver to take all remaining actions necessary to terminate the receivership, (e) discharge Morris-Anderson & Associates, Ltd. from its duties as Receiver, (f) terminate the Receiver Bond previously posted by Morris-Anderson & Associates, Ltd., and (f) exculpate Morris-Anderson & Associates, Ltd. and related parties from any claims that could be asserted against them in connection with this case. A copy of the Motion may be obtained by request from the undersigned.

**PLEASE TAKE NOTICE** that any person or entity that objects to the Motion must submit their objections in writing with the undersigned counsel for the Receiver so that such correspondence is received no later than October 26, 2012 that describes with specificity the legal and factual basis for the objection. If a timely objection is made, a hearing on such objection shall be held on November 9, 2012 at 10:00 a.m. in Courtroom 16-South, U.S. Courthouse, 111 S. Tenth St., St. Louis, MO 63102. If no objections are timely filed, the Court may enter an order granting the Motion without a hearing.

Dated: September 17, 2012

THOMPSON COBURN LLP

By: */s/ David A. Warfield*
David A. Warfield, ED Mo. #34288MO
One US Bank Plaza
St. Louis, MO 63101
Phone: (314) 552-6000
Fax (314) 552-7000
dwarfield@thompsoncoburn.com

*Attorneys for Receiver Morris-Anderson & Associates, Ltd.*

**Exhibit B**

**Proposed Order**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **BANK OF AMERICA, a national banking association,** ) ) ) | |
| Plaintiff, ) ) | Case No. 4:10-cv-00563-RWS |
| v. ) ) | |
| **ANALYTICS, INC., a Missouri corporation, *et al.*,** ) ) ) | |
| Defendants. ) ) | |

**ORDER TERMINATING RECEIVERSHIP AND GRANTING OTHER RELIEF**

This matter comes before the Court upon the *Receiver's Amended Motion to Approve Receivership Wind Down and Other Ancillary Relief* (Dkt. No. ____) (the "Amended Motion").[5] This Court having previously entered its Order directing the Receiver to give notice to all parties filing proofs of claim in this case of (a) the filing of the Amended Motion and of (b) an opportunity to submit objections to the Amended Motion (the "Creditor Notice"). It further appears that the Creditor Notice was mailed on September __, 2012 to all of those parties set forth on the Certificate of Service filed by the Receiver on September __, 2012 (dkt. #___) and that no timely objections were submitted. Good cause exists for entry of this Order,

IT IS HEREBY ORDERED that the Motion is GRANTED.

IT IS FURTHER ORDERED that the Receiver shall distribute to Bank of America, N.A. (the "Bank") all cash remaining in the receivership less $50,000 (the "Contingency Reserve") which shall be held by the Receiver to pay any additional expenses of the Receivership, with the

---

[5] All capitalized terms not otherwise defined in this Order shall have the same meaning as set forth in the Amended Motion.

then remaining balance of the Contingency Reserve to be paid to Bank on or about 180 days after the date hereof.

IT IS FURTHER ORDERED that the Accounting described in the Amended Motion is approved.

IT IS FURTHER ORDERED that the professional fees described in the Amended Motion are approved and that the Receiver is authorized and directed to pay such professionals any amounts that have not heretofore been paid.

IT IS FURTHER ORDERED that the Morris-Anderson & Associates, Ltd. is authorized and directed to take any and all steps necessary in order to wind up the administration of the Receivership Companies, including but not limited to (a) completing the audit of the Pension Plan, (b) paying all remaining expenses of administration of the receivership estate, (c) terminating the Receiver's Bond, and (d) signing and filing all final income tax returns.

IT IS FURTHER ORDERED that neither the Receiver, nor any agents, employees, officers, directors, or professionals employed by the Receiver (collectively, the "Receiver Parties"), shall have or incur any liability to, or will be subject to any right of action, by any of the Defendants, any creditors of the Defendants, or any other persons, or their respective officers, directors, employees or professionals or by any creditor of any the Defendants, for or in connection with any of the Receiver Parties' actions or conduct in connection with the receivership or this case.

Dated _____, 2012

_____
Hon. Rodney W. Sippel
United States District Judge